IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONNA RAYE GOOD,          *
                  *
       Plaintiff,        *
                  *
       v.                *        Case No. SAG-09-cv-2030
                  *
MICHAEL J. ASTRUE,          *
Commissioner of Social Security,     *
                  *
       Defendant.       *

******

**MEMORANDUM**

Pending before this Court, by the parties' consent, are cross–motions for summary judgment concerning the Commissioner's decision denying Donna Raye Good's claims for Supplemental Security Income ("SSI") and Disability Insurance benefits ("DIB"). (ECF Nos. 1, 3, and 5). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed. 42 U.S.C. § 405(g); Craig v. Chater, 76 F.3d 585, 589 (4th Cir.1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987). A hearing is unnecessary. Local Rule 105.6. For the reasons that follow, this Court GRANTS Ms. Good's alternative motion for remand and DENIES the Commissioner's motion.

**I. BACKGROUND**

Donna Raye Good ("Ms. Good" or "Claimant"), applied for DIB and SSI on January 1, 2006, alleging that she has been disabled since December 15, 2005 due to bipolar disorder, sleep apnea, anxiety, vision problems, and obsessive compulsive disorder. (Tr. 52). Her claims were denied initially and upon reconsideration. (Tr. 49-54). A hearing was held before the Honorable Melvin Benitz, Administrative Law Judge ("ALJ"), on November 20, 2007, where Ms. Good

1

appeared with counsel and testified. (Tr. 1142-85). The ALJ subsequently denied Ms. Good's claims in a decision dated January 30, 2008. (Tr. 13-25). The ALJ found that although Claimant's degenerative disc disease, status post right hip replacement, and bipolar disorder were all "severe" impairments as defined in the Regulations, they did not meet or medically equal any of the listed impairments found in the Regulations. (Tr. 17-20). The ALJ further found that the record did not substantiate Ms. Good's claim that she suffers from Wegener's disease, and that her sleep apnea and left eye vision problems did not cause any functional restrictions and therefore were non-severe impairments. (Tr. 18). The ALJ also determined that Claimant retained the residual functional capacity to perform sedentary, unskilled work. (Tr. 20-23). The ALJ found that Claimant was not able to perform any of her past relevant work ("PRW"). (Tr. 23). After receiving testimony from a vocational expert ("VE") and considering the Claimant's age, education, work experience, and residual functional capacity, the ALJ determined there were jobs that existed in the national and local economies in significant numbers which Ms. Good could perform. Accordingly, the ALJ found that Ms. Good was not disabled. (Tr. 25). On June 26, 2009, the Appeals Council denied Claimant's request for review, making her case ready for judicial review. (Tr. 1-4).

## II. STANDARD OF REVIEW

The function of this Court is not to review Ms. Good's claim *de novo* or reweigh the evidence of record. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Rather, this Court is to determine whether, upon review of the whole record, the Commissioner's decision is supported by substantial evidence and a proper application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990); Coffman, 829 F.2d at 517; see 42 U.S.C. § 405(g) (2009).

Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1996). It is such relevant evidence as a reasonable mind might accept as adequate to support a verdict were the case before a jury. Johnson v. Califano, 434 F.Supp. 302, 307 (D.Md.1977). Usually, if substantial evidence supports the Commissioner's decision, the decision must be upheld. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir.1986); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972); *see* 42 U.S.C. § 405(g).

In addition to reviewing the ALJ's decision to determine whether it is supported by substantial evidence, this Court also must determine whether the ALJ properly applied the law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman, 829 F.2d at 517. After reviewing the ALJ's decision, this Court may affirm, modify, or reverse the decision of the ALJ and may remand the case for a rehearing. Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991); Coffman, 829 F.2d at 519; Vietek v. Finch, 438 F.2d 1157, 1158 (4th Cir.1971); *see* 42 U.S.C. § 405(g).

In determining whether a claimant is disabled within the meaning of DIB, the Commissioner has promulgated regulations that set forth the following five-step sequential evaluation procedure.

> (1) The ALJ determines whether the claimant is engaged in substantial gainful activity as defined in 20 C.F.R. § 404.1571 and § 416.971 *et seq*. If so, the claimant is not disabled.
>
> (2) If the claimant is not engaged in substantial gainful activity, the ALJ examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. § 404.1520 and § 416.920. If not, the claimant is not disabled.
>
> (3) If the claimant's physical and/or mental impairments meet the durational and severity requirements set forth in 20 C.F.R. § 404.1520 and § 416.920, the ALJ considers whether the impairment or impairments, either severally or in

combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, known as the Listing of Impairments. If so, the claimant is disabled.

(4) If the claimant's impairment or impairments do not meet or equal a listed impairment, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to do past relevant work ("PRW"). If so, the claimant is not disabled.

(5) If the claimant does not retain the RFC to do past relevant work, the ALJ determines whether the claimant is capable of some other work based on the claimant's RFC, age, education, and past work experience. The Commissioner bears the burden of proof at step five. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995). If the claimant is not capable of other work, the claimant is disabled.

See 20 C.F.R. §§ 404.1520, 416.920 (2009); Bowen v. Yuckert, 482 U.S. 137 (1987).

When evaluating a claimant's mental impairments, the ALJ must follow a special technique outlined in 20 C.F.R. § 404.1520a(b) at each level in the administrative review process. The ALJ must document application of this technique in his decision. 20 C.F.R. § 404.1520a(e). The ALJ must first evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether a medically determinable mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). If a medically determinable mental impairment exists, the ALJ must rate the degree of functional limitation. 20 C.F.R. § 404.1520a(b)(2). To rate the degree of functional limitation, the ALJ must consider "all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment." 20 C.F.R. § 404.1520a(c)(1). The ALJ must make findings as to the degree of restrictions, if any, in four areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.[1] 20 C.F.R. § 404.1520a(c)(3).

---

[1] Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 CFR § 404, Appx. 1, 12.00(C)(4).

4

**III. ALJ'S DECISION**

After reviewing the medical record and hearing testimony, the ALJ evaluated Ms. Good's claims using the Social Security Administration's five-step sequential process and made the following relevant enumerated findings:

2. The claimant has not engaged in substantial gainful activity since December 15, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, status post right hip replacement; and bipolar disorder (20 CFR 404.1520(c), and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as that term is defined in the Dictionary of Occupational Titles, but that due to the claimant's psychological limitations resulting from the symptoms of her bipolar disorder in addition to the side-effects of her medications, the claimant has decreased reliability concentration, and persistence such that she can perform only an unskilled level of sedentary work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 15, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-25).

**IV. SUMMARY OF EVIDENCE**

At the time of her administrative hearing, Donna Raye Good was a forty-three year old female Army veteran with a family history of mental illness. (Tr. 59, 373, 1165). She was five feet, seven inches tall and weighed 160 pounds at the time of the hearing. (Tr. 1165). Ms. Good has a twelfth-grade education and can read and write in English. (Tr. 1145, 1166). She alleged disability due to bipolar disorder, sleep apnea, anxiety, vision problems with her left eye, obsessive-compulsive disorder, and Wegener's disease.[2] (Tr. 76, 1145). At her hearing, she also alleged that chronic low back pain contributed to her disability.

    **A. Evidence of Mental Impairments**

Martin J. Brandes, M.D., a psychiatrist at the VA hospital in Baltimore, began treating Ms. Good in at least July 2003 and continued to treat her through January 25, 2006. (Tr. 193-313). During that time, Dr. Brandes diagnosed Ms. Good with a depressive disorder, sometimes characterized as a major depressive disorder, and bipolar disorder. Id. Through the course of treatment, Dr. Brandes assigned the Claimant a Global Assessment of Functioning ("GAF") rating that ranged between 55 and 62.[3] Id.

Ms. Good was voluntarily hospitalized at the VA Hospital in Baltimore on February 9, 2006 for severe depression and suicidal ideation; she discharged herself from the hospital the following day. (Tr. 367, 385-417).

---

[2] As noted above, the ALJ found that the record did not substantiate Ms. Good's claim that she suffers from Wegener's disease, and that her sleep apnea and left eye vision problems did not cause any functional restrictions and therefore were non-severe impairments. (Tr. 18).

[3] Medical reports by psychiatrists and psychologists often contain assessments of psychological, social, and occupational functioning known as the Global Assessment of Functioning ("GAF") Scale. A GAF code between 51 and 60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). A GAF code between 41 and 50 signals serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Am. Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th Ed. 1994).

Mental health professionals the Eastern Shore Psychological Services began treating Ms. Good on March 23, 2006 and continued to see Ms. Good on a mostly weekly basis through at least May 8, 2007. (Tr. 730-778, 1083-1105).

On June 12, 2006, psychologist Bruce Hutchison, Ph.D., examined Ms. Good and completed a psychological report on Ms. Good for the Maryland Disability Determination Services agency. (Tr. 662-69). Dr. Hutchison based his findings on his examination of Ms. Good, progress reports completed by Dr. Brandes, and various other medical records. Id. Dr. Hutchison agreed with Dr. Brandes' diagnosis of bipolar disorder. Id. His report further indicated that Ms. Good was able to complete a number of daily living activities, such as cooking and cleaning. Id.

On June 15, 2006, state agency consulting psychologist Michael Oidick, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 670-86). Dr. Oidick agreed with the previous diagnoses of bipolar disorder and noted that Ms. Good has "moderate" limitations in the areas of social functioning, and maintaining persistence, concentration, and pace. (Tr. 684). Dr. Oidick also noted that Ms. Good had had "one or two episodes" of decompensation that were of extended duration, as well as "mild" limitations in the restriction of daily living activities. Id. Overall, Dr. Oidick concluded that Ms. Good was moderately limited in 12 of the 20 areas listed on the mental RFC assessment. (Tr. 670-71). Dr. Oidick concluded that Ms. Good has the mental capacity for simple, unskilled work, though her mood may affect her social interactions and motivations. (Tr. 686).

On November 3, 2006, state agency consulting psychologist Michele Walklett, Psy.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 711-28). Dr. Walklett opined that Ms. Good suffers from bipolar disorder, panic attacks, and abuse of prescription

medication and found that Ms. Good had "moderate" limitations in dealing with activities of daily living, in her ability to interact and relate with others socially, and in her abilities of concentration, persistence, and pace. (Tr. 713). Overall, Dr. Walklett found that Ms. Good was moderately limited in 11 of the 20 areas listed on the mental RFC assessment. (Tr. 711-12).

On September 26, 2007, psychotherapist Dr. Valerie Lamont of Eastern Shore Psychological Services completed a Mental Residual Functional Capacity Questionnaire. At the time she completed the questionnaire, Dr. Lamont had treated Ms. Good for over a year. Dr. Lamont assessed Ms. Good with a GAF score of 50, and noted that Ms. Good's highest GAF score in the past year had been 45. Dr. Lamont found that Ms. Good was unable to meet competitive standards or had no useful ability to function for 11 of the questionnaire's 16 mental abilities and aptitudes needed to perform unskilled work. (Tr. 910). Dr. Lamont also found that Ms. Good was seriously limited, unable to meet competitive standards, or had no useful ability to function in a number of other areas; Dr. Lamont noted that Ms. Good's "mood swings and other symptoms of bi-polar, along with numerous medication side effects preclude any sustained work activity." (Tr. 910-11).

### B. Evidence of Physical Impairments

Ms. Good was admitted to Memorial Hospital at Easton on March 18, 2006, with complaints of acute back and leg pain. (Tr. 629-39). An MRI taken that day showed moderate diffuse discogenic narrowing in the lumbar spine as well as mild narrowing at all the intervertebral lumbar levels. (Tr. 640). Another MRI taken on March 28, 2006 showed early signs of mild to moderate stenosis in the lumbo-sacral spine. (Tr. 641).

On July 6, 2006, orthopedist Glenn Hardy, M.D., noted that these MRIs showed "nothing serious;" Dr. Hardy's physical examination on the same day showed that Ms. Good had fair to good flexion, extension and lateral bending of the lumbar spine with mild pain. (Tr. 700.)

On April 10, 2007, Ms. Good underwent hip replacement surgery to alleviate pain and improve function in her right hip. In a post-surgical follow-up on June 27, 2007, orthopedist Myron Szczukowski, M.D., noted that Ms. Good had a "nice gait" and "gets up and down nicely." (Tr. 1122). Though Ms. Good had sometimes used a cane prior to her hip replacement, she no longer used a cane after the surgery. (*See* Tr. 897).

On July 2, 2007, orthopedist Benjamin Knox, M.D. noted that Ms. Good had "minimal tenderness" over the lumbar spine and that surgery was not indicated. (Tr. 1121).

On October 30, 2006, state consulting physician James Biddison, M.D., completed a Physical Residual Functional Capacity Assessment for Ms. Good. (Tr. 703-10). Dr. Biddison, who based his opinion on the record and did not examine the Claimant, found that Ms. Good was capable of lifting 10 pounds frequently and 20 pounds occasionally; standing and/or walking about six hours in an eight-hour work day; and sitting about six hours in an eight-hour work day. Id. He otherwise found no physical limitations on Ms. Good's capacity to work. Id.

## V. ANALYSIS

Ms. Good's primary argument is that the ALJ improperly assessed her RFC at step four of the sequential evaluation process used to determine whether a claimant is disabled. Ms. Good argues that the ALJ erred in the following ways: (1) by failing to conduct the "function by function" assessment of the Plaintiff's ability to perform the exertional and non-exertional work requirements; (2) by failing to properly assess and discuss relevant evidence in connection with the RFC finding; and (3) by failing to include any limitations on social functioning,

concentration, persistence, or pace in his RFC assessment of Ms. Good and in his hypothetical question to the VE. Ms. Good also argues that the ALJ erroneously evaluated her subjective complaints of pain.

### A. The ALJ Improperly Calculated Ms. Good's RFC at Step Four.

In determining Ms. Good's residual functional capacity, the ALJ stated that

> [C]laimant has the residual functional capacity to perform sedentary work as that term is defined in the Dictionary of Occupational Titles, but that due to the claimant's psychological limitations resulting from the symptoms of her bipolar disorder in addition to the side-effects of her medications, the claimant has decreased reliability concentration, and persistence such that she can perform only an unskilled level of sedentary work.

(Tr. 20). This RFC assessment limits Ms. Good to "unskilled" work. Social Security regulations, however, require that the

> [R]FC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). . . .The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184 at *4, *7 (July 2, 1996). The ALJ's discussion of Ms. Good's mental limitations at steps two and three is not an RFC assessment and did not satisfy the ALJ's duties at step four of the sequential evaluation.[4] SSR 96-8p, in relevant part, states as follows:

> [T]he adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the

---

[4] The Introduction to Listing 12.00 Mental Disorders, in relevant part, states:

> An assessment of your RFC complements the functional evaluation necessary for paragraphs B and C of the listings by requiring consideration of an expanded list of work related capacities that may be affected by mental disorders when our impairment is severe but neither meets nor is equivalent in severity to a listed mental impairment.

20 CFR § 404, Subpt. P, App. 1 (2011); see also SSR 96-8p, 1996 WL 374184 at *4, *7 (July 2, 1996).

10

adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

Id. at *4.

The state's consulting mental health professionals, Dr. Michael Oidick and Dr. Michelle Walklett, both found that Ms. Good is "moderately" limited in a variety of the areas included in the mental RFC assessment. As mentioned above, Dr. Oidick found that Ms. Good is moderately limited in twelve of the twenty areas addressed by the mental RFC assessment. (Tr. 670-71). These areas of moderate limitation include the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers; and the ability to respond appropriately to changes in the work setting. Id. Dr. Walklett found that Ms. Good has moderate limitations in eleven such areas, including all of those mentioned above. (Tr. 711-12.)

The ALJ's assessment is inadequate because it does not fully discuss the many moderate limitations identified by Drs. Oidick and Walklett. As a result, it is unclear whether an individual with eleven or twelve "moderate" limitations would be about to perform the work described in the ALJ's hypothetical. The ALJ's failure to specifically reference the many moderate limitations found by Drs. Oidick and Walklett is improper because many of those limitations relate to abilities essential to unskilled work. See Barton v. Astrue, 495 F.Supp.2d 504, 511 (D.Md. 2007) (citing Masch v. Barnhart, 406 F.Supp.2d 1038, 1054 (E.D.Wis. 2005)). The basic mental demands of unskilled work include "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision,

coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857 at *4 (1985).

Because the ALJ's hypothetical did not reference the moderate limitations found by Drs. Oidick and Walklett, it is unclear whether the jobs identified by the VE involved skills beyond the Claimant's RFC. As a result, this Court is unable to determine whether the ALJ's findings at steps four and five were supported by substantial evidence.

### B. The ALJ's Reliance on the Vocational Expert's Testimony Is Not Supported by Substantial Evidence.

In evaluating whether Ms. Good could perform any kind of work, the ALJ relied on the testimony of vocational expert ("VE") Louis Szollosy. (Tr. 1173-84). The ALJ posed the following hypothetical to the VE:

> ALJ: I'd like for you to assume a person who is 41-years of age on her onset, has a twelfth grade education, past relevant work as indicated. . . .And suffering from various ailments including depression with a bipolar component. . . .And the file indicates that she has a *left eye deficiency*, but she seems to see alright. . . . *[W]ith occasional mood swings* due to her bipolar component somewhat relieved by her medication without significant side effects, but she indicated in her testimony she derives some blurriness or lack of concentration and sleepiness . . . . If I find that she needs simple routine unskilled jobs, low stress, no concentration, low memory. She *seems to have moderate limitations in areas dealing with her* activities of daily living and *ability to interact and relate with others socially*. . . . Are there jobs that, she could in the national economy in significant numbers in your opinion as a vocational expert?
>
> VE: Your Honor, there would be positions that she could do. *The primary concern, given the hypothetical that you just provided, with the, with potential blurred vision issues as well as with the mood swings and moderate, as far as interacting with people,* there are positions such as – *I would say she would have the capability if it wasn't for those particular issues I just mentioned.*

(Tr. 1174-76 (emphasis added)).

Albeit in a convoluted fashion, the ALJ's hypothetical outlines Ms. Good's limitations in detail, including blurred vision, mood swings, and limitations in social interactions with others. The VE responded that there were no jobs for a hypothetical person with blurred vision, mood

12

swings, and difficulties in social interactions. However, these are the very limitations that the ALJ posed in his hypothetical. (Tr. 1175-76). The VE's response is equivocal, at best.

The ALJ's decision inaccurately summarized the VE's ambiguous opinion by stating that "[t]he vocational expert testified that given all of these factors the claimant would be able to perform the requirements of representative sedentary, unskilled occupations." (Tr. 24). The ALJ then found that "[b]ased on the testimony of the vocational expert . . . the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate." (Tr. 25).

The ALJ's decision is based on an inaccurate summary of the VE's testimony. In fact, the VE found that there were no available jobs for a person who had all the limitations outlined in the ALJ's hypothetical. (Tr. 1175-76). Furthermore, the ALJ has not explained the discrepancy between his own analysis and the VE's testimony. For these reasons, the ALJ's finding cannot stand.

### VI. Conclusion

For the foregoing reasons, the Court GRANTS Claimant's alternative motion for remand, and DENIES Defendant's Motion. A separate order follows.


Dated: September 27, 2011                       \_\_/s/_____
                                                                         Stephanie A. Gallagher
                                                                         United States Magistrate Judge